**Opinion issued December 29, 2020**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-19-00156-CR

———————————

**ANGEL LEE RANKIN, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 209th District Court**
**Harris County, Texas**
**Trial Court Case No. 1325037**

---

## O P I N I O N

A jury convicted appellant, Angel Lee Rankin, of murder. After rejecting her

claim of sudden passion, the jury assessed punishment at 15 years' confinement in

the Institutional Division of the Texas Department of Criminal Justice. In four issues,

Rankin contends that (1) the trial court erred by denying her motion to suppress her

statements, (2) the evidence is insufficient to defeat her self-defense claim, (3) the evidence is insufficient to support the jury's negative finding on sudden passion, and (4) the trial court erred by denying her motion for mistrial after a spectator's outburst during defense counsel's opening statements. We affirm.

## Background

### *The Stabbing Incident*

One fall evening, Rankin went to the gas station to get snacks. Shortly after leaving her apartment complex, Rankin's car broke down. Her car was known for having "electrical problems with the wiring." Rankin always kept a pink paring knife in her car to open the hood because her car had been damaged in an accident. This occasion was no different.

Rankin called her 13-year-old daughter, M.R.[1] She also called her boyfriend, Steven Willis, "a whole bunch of times" to help her jump start the disabled car because he was driving her Oldsmobile Cutlass. Willis eventually arrived, parked the Cutlass next to her car, and pushed her car into a washateria parking lot. While Willis retrieved the jumper cables from the trunk, Rankin took the knife from her knife kit to unlatch the hood. Meanwhile, M.R. went outside to check on her mother and saw Rankin and Willis in the washateria parking lot across the street. M.R. heard

---

[1] We will refer to Rankin's daughter as "M.R." to protect her identity. *See* TEX. R. APP. P. 9.10(a)(3).

Willis "yelling" and saw him behaving "very aggressively." She noticed that Willis's "nostrils had flared up" and that his "face turned very bright red" with "rage."

According to Rankin, Willis "had an attitude" and acted "bother[ed]" when he first arrived to help her. As she was trying to unlatch the hood, Rankin repeatedly asked Willis where he had been. He responded, "Shut the fuck up." Next, Rankin asked him why he had not answered her calls sooner. She continued to question him. Eventually, Rankin no longer wanted Willis to help her because he grew increasingly "frustrated." She told him, "You know what? Don't worry about it. I'll figure it out myself. But you will not take my car."

At that moment, M.R. saw Willis grab and lunge at Rankin. M.R. then "turned around and ran to get" a bat from their apartment. Meanwhile, Willis exclaimed, "Bitch, I'll kill you!" He grabbed Rankin's right wrist with his left hand, squeezed it, and began to choke her. He choked her for at least 30 seconds.Rankin begged Willis to release her neck and "cr[ied] out to God" because she started to "lose [her] breath" and felt like she "was about to die." Rankin struggled to pry her wrist from Willis's hand. Rankin still had the knife in her hand. When she broke free from his grasp, Rankin "called out for help from God," "took the knife," and "poked him once to get him off of" her. In describing what happened after she "poked" him with the knife, she explained:

> He lets go of me, he walks away, he gets back into the Cutlass, he starts the Cutlass, he reverses the Cutlass, he backs out of the position the car was in, to drive off.
>
> . . . .
>
> When he gets to the intersection to exit the parking lot, he doesn't turn. The car stops. He puts the car in park, he gets out of the car, he walks a little bit behind the car, and he drops.

As Willis walked away, Rankin sat in her car and cried with the door open. When she noticed Willis fall to the ground, Rankin ran over to help him. Because Willis was unconscious and unresponsive, Rankin picked him up, "put him in the passenger seat of the Cutlass," and called 911. While on the phone with the 911 operator, Rankin decided that she could get to the hospital quicker than an ambulance. She "took off . . . doing 95 [mph] down Fondren the whole way." By the time M.R. returned with the bat, she saw her mother's car there, but the Cutlass, her mother, and Willis were gone.

***The Emergency Room Visit***

Rankin and Willis arrived at the Southwest Hermann Memorial Hospital "six minutes" later. Willis had a stab wound to the chest and was unresponsive.[2] The emergency room physician and other hospital workers carried him onto a stretcher and tried to resuscitate him by performing CPR.

---

[2] Dr. R. McKowen described Willis's stab wound as a "relatively clean incision, straight line" that "wasn't rough or jagged." His heart had been "lacerat[ed]."

A police officer sitting at the front desk of the hospital asked Rankin, "Who did this?" She responded, "I did." Houston Police Department Detective A. Hernandez came to the hospital to investigate the cause of Willis's injuries. Police took Rankin's cell phone, identification, and other items from her. There is a dispute about whether officers immediately handcuffed Rankin.[3] Detective Hernandez met with Rankin. She did not advise Rankin of her constitutional rights under *Miranda v. Arizona*[4] before questioning her about the incident.

Rankin explained that she called Willis to assist her with her car troubles. She also told Detective Hernandez that an argument ensued. She did not, however, tell Detective Hernandez that Willis had choked her because she was "afraid that once he got out of the hospital, if they were to arrest him, he was going to come hurt [her]." After the argument, Rankin realized that the knife in her right hand had accidentally penetrated Willis's chest when he had bent over. She also told Detective Hernandez that Willis "walked away" towards the Cutlass, sat in the car and then got out again, "took off his shirt," "grabbed his chest," and "fell to the ground." That is when Rankin first called the police and then rushed Willis to the hospital.

---

[3]    Rankin testified that an officer immediately put handcuffs on her. Detective Hernandez, however, testified that she was not handcuffed or under arrest.

[4]    *Miranda v. Arizona*, 384 U.S. 436 (1966).

Rankin's "story seemed incomplete" to Detective Hernandez. She called the District Attorney's Office to "discuss the case," but they declined to charge her. Afterwards, Detective Hernandez "contacted the Homicide Division and requested investigators come to the hospital." When the other officers arrived, Rankin signed consent forms authorizing officers to search and seize her car and the Cutlass. Detective Hernandez handcuffed Rankin under Houston Police Department policy requiring officers to handcuff all persons transported for security. She drove Rankin to the Homicide Division for further questioning.

### The Investigation

Officer R. Lujan met with Rankin. He told her that she was there voluntarily, she was not in any trouble, and he only wanted to get information about the incident. He did not read her *Miranda* warnings before taking her statement. Rankin repeated the version of events that she had given Detective Hernandez earlier, but she omitted the details about the argument and physical altercation. As before, Rankin never told Officer Lujan that Willis tried to choke or otherwise hurt her. Rankin did not appear injured. Officers returned her purse, identification, and cell phone to her and took her home after she gave her statement. Willis later died from his injuries.

### The Suppression Hearing and Jury Trial

The State indicted Rankin for murder. Before trial, Rankin moved to suppress the statements she made to the officers. Rankin, Detective Hernandez, Officer Lujan,

and Officer B. Evans testified at the suppression hearing. At the end of the hearing, the trial court denied Rankin's motion to suppress:

> At this time, I'll find that the statement, although it did not comply with *Miranda*, that she was not under arrest or part of custodial interrogation and that it was voluntarily made. I find the statements by Ms. Rankin made about her time in the video room are entirely inconsistent, which is what is on that video room, specifically about asking to call her daughter, specifically about asking to use the bathroom. The fact that she was transported in handcuffs alone does not rise to custodial interrogation.

At trial, during defense counsel's opening statement, a spectator yelled, "That's all lies!" Defense counsel immediately moved for a mistrial. Outside the presence of the jury, the trial court reprimanded the spectator and ordered him to leave the courtroom. After dismissing the spectator, the trial court denied the motion for mistrial.

Defense counsel then asked the trial court to instruct the jury to disregard the outburst, and the trial court gave the following instruction to the jury:

> Ladies and gentlemen, sorry for the interruption. We're not sure—the person is not a witness and will not be returning to the courtroom. He is ordered to be—he will not be back in the courtroom during the proceedings of this case. The only thing that you may consider as evidence in this case is evidence that's introduced to you and evidence received from the witness stand. I'm going to instruct you to disregard the statements from the audience. All right?

The jury convicted Rankin of murder, rejected her claim of sudden passion, and assessed punishment at 15 years' confinement in the Institutional Division of the Texas Department of Criminal Justice. This appeal followed.

7

**Motion to Suppress**

In her first issue, Rankin contends that the trial court erred by denying her motion to suppress her statements to police at the hospital and at the police station. She argues that admission of the inculpatory statements was error because she was in custody when she made the statements but the officers never provided her with statutory warnings under Article 15.17 or Article 38.22 of the Texas Code of Criminal Procedure.[5] *See* TEX. CODE CRIM. PROC arts.15.17, 38.22. The State maintains that the trial court did not err because Rankin was not in custody when she made the statements. The State does not dispute that officers did not read Rankin the statutory warnings.

**A.    Standard of review**

We review a trial court's decision to deny a motion to suppress for an abuse of discretion. *Martinez v. State*, 348 S.W.3d 919, 922 (Tex. Crim. App. 2011). "We view the record in the light most favorable to the trial court's conclusion and reverse the judgment only if it is outside the zone of reasonable disagreement." *State v. Dixon*, 206 S.W.3d. 587, 590 (Tex. Crim. App. 2006). At a hearing on a motion to suppress, the trial court is the sole judge of the credibility of the witnesses and the "weight to be given their testimony." *Romero v. State*, 800 S.W.2d 539, 543 (Tex.

---

[5]    Articles 15.17 and 38.22 incorporate the requirements of *Miranda*. *Miranda*, 384 U.S. at 444; *Oursbourn v. State*, 259 S.W.3d 159, 171–72 (Tex. Crim. App. 2008).

Crim. App. 1990) (en banc). A trial court's determination about whether a suspect is in custody presents a mixed question of law and fact. *Herrera v. State*, 241 S.W.3d 520, 526 (Tex. Crim. App. 2007). We therefore "afford almost total deference to a trial judge's 'custody' determination when the questions of historical fact turn on credibility and demeanor." *Id.* at 526–27. "Conversely, when the questions of historical fact do not turn on credibility and demeanor, we will review a trial judge's 'custody' determination *de novo.*" *Id.* at 527.

## B.     Applicable law

Police must give warnings required by *Miranda* and the Texas Code of Criminal Procedure if a suspect is interrogated in custody. *Estrada v. State*, 313 S.W.3d 274, 293 (Tex. Crim. App. 2010). The prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it shows the use of procedural safeguards effective to secure the privilege against self-incrimination. *Miranda*, 384 U.S. at 444. Additionally, Article 15.17 mandates an officer to provide the accused of warnings, including her right to retain counsel, right to remain silent, and right to terminate the interview at any time.[6] *See* TEX. CODE CRIM. PROC. art. 15.17(a). Article 38.22 precludes the use of

---

[6]     Article 15.17, applying to magistrates and officers, describes the statutory duties, in pertinent part, as follows:

The magistrate shall inform in clear language the person arrested, either in person or through a videoconference, of the accusation against him and of any affidavit

9

statements that result from custodial interrogation without compliance with its procedural safeguards. *See id*. art. 38.22, § 2(a) (no statement made as a result of a custodial interrogation will be admissible against the accused in a criminal proceeding unless, among other things, officers administer statutory warnings to the accused before the accused gives a statement).

"The defendant bears the initial burden of proving that a statement was the product of 'custodial interrogation.'" *Herrera*, 241 S.W.3d at 526. "Custodial interrogation" means questioning initiated by police officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. *Miranda*, 384 U.S. at 444; *Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex. Crim. App. 1996) (citing *Stansbury v. California*, 511 U.S. 318, 322–25 (1994) (per curiam)).

Four general situations suggest that a person may be in custody: (1) when the suspect is physically deprived of her freedom in any significant way; (2) when a law enforcement official tells the suspect that she cannot leave; (3) when law

---

filed therewith, of his right to retain counsel, of his right to remain silent, of his right to have an attorney present during any interview with peace officers or attorneys representing the state, of his right to terminate the interview at any time, and of his right to have an examining trial. The magistrate shall also inform the person arrested of the person's right to request the appointment of counsel if the person cannot afford counsel. The magistrate shall inform the person arrested of the procedures for requesting appointment of counsel. TEX. CODE CRIM. PROC. art. 15.17(a).

enforcement officials create a situation that would lead a reasonable person to believe there has been a significant restriction upon her freedom of movement; and (4) when there is probable cause to arrest and law enforcement officers do not tell the suspect that she is free to leave. *Shiflet v. State*, 732 S.W.2d 622, 629 (Tex. Crim. App. 1985) (en banc). For the first three situations, the "restriction upon freedom of movement must amount to the degree associated with an arrest as opposed to an investigative detention." *Dowthitt*, 931 S.W.2d at 255. For the fourth situation, the officers' knowledge of probable cause must be "manifested to the suspect." *Id*. This manifestation could occur if some "information substantiating probable cause is related by the officers to the suspect or by the suspect to the officers." *Id*. And because probable cause is a "factor" in other cases, the fourth situation does not automatically establish custody. *Id*. Custody is established if the manifestation of probable cause, combined with other circumstances, would lead a reasonable person to believe that she is under restraint to the degree associated with an arrest. *Id*.

## C.    Custodial Interrogation

First, Rankin argues that she was in custody because she made a "pivotal admission of guilt." She asserts that she was "handcuffed as soon as she admitted responsibility for [Willis's] condition," placed in a room for "several hours," and "told she could not leave the room until the police arrived." She also asserts that she was not allowed to go to the restroom, was not free to leave, and was not allowed to

call M.R., despite asking for those things. In response, the State argues that "the trial court questioned the veracity of [Rankin's] testimony and found her testimony to be incredible." For example, the State points out that the video of the interview does not show that the officers told Rankin she could not leave. Indeed, the video shows that she had spoken with her daughter twice that night despite Rankin's testifying that she was not allowed to call her daughter.

Rankin relies on *Ruth v. State*, 645 S.W.2d 432 (Tex. Crim. App. 1979). In *Ruth*, the Texas Court of Criminal Appeals held that an interrogation became custodial because the police officer had probable cause to arrest him, considering that the suspect admitted to shooting the victim, explained his motive, and reenacted the offense. *Id.* at 435. The Court considered the police officer's subjective intent, the suspect's subjective belief, the investigation's focus, and whether there was probable cause for arrest. *Id.* at 436. The police officer did not give *Miranda* warnings and "inten[ded] to restrain the appellant until he made a statement." *Id.* This intention prompted the suspect's "subjective belief that he was required to answer [the questions]" and there was probable cause to arrest the suspect. *Id.* Based on the totality of these circumstances, the Court held that the suspect was in custody following the statement. *Id.*

Rankin's reliance on *Ruth* is misplaced. Witnesses testified that Rankin was not handcuffed or arrested. During the suppression hearing, Detective Hernandez

12

testified that Rankin was not in handcuffs or under arrest when she arrived at the hospital. Officer Evans also testified that Rankin was not in handcuffs and not under arrest. Unlike the police officer in *Ruth*, the police officers here testified that they questioned Rankin to "gather more information" about the cause of Willis's injuries and tried to determine "how the event unfolded." Nothing in the record suggests that the officers intended to restrain Rankin until she made a statement. In fact, Detective Hernandez and Officer Evans both testified that Rankin was free to leave. Nor does the record show that the officers knew that the incident was more than a mere accident. Rankin testified that she intentionally omitted the details relating to the choking from her statement. She was "afraid that once [Willis] got out of the hospital, if they were to arrest him, he was going to come hurt [her]."

The facts here are similar to those in *Estrada*. In *Estrada*, an officer questioned the defendant about his involvement in murders for five hours without first Mirandizing him. *Estrada*, 313 S.W.3d at 290, 292. The defendant incriminated himself. *Id*. at 290. The officer accused the defendant of lying and told him that he was free to leave, and the defendant acknowledged that he was there voluntarily and did not have to listen to the officer's accusations. *Id*. At that point, the defendant told the officer that he did not want to continue talking and that he wanted the police to give him a ride home. *Id*. The officer stopped questioning him and took him home. *Id*.

13

The Court of Criminal Appeals held that the defendant was not in custody for *Miranda* and Article 38.22 purposes. *Id.* at 295. The court reasoned that no reasonable person would believe that he could not leave. *Id.* The court determined the defendant could have "simply walked out" or "asked the police for a ride home," which he did. *Id.*

Like the defendant in *Estrada*, Rankin could have left the hospital or asked the police for a ride home, but she did not. The evidence suggests that the officers' encounter with Rankin was a consensual one. During a consensual encounter, an officer may initiate contact with a person without having an objective level of suspicion, question the person, and ask for identification as long as the officer does "not convey a message that compliance with their requests is required." *Florida v. Bostick*, 501 U.S. 429, 434–35 (1991). The officers here did just that. They contacted Rankin in person, asked her questions about the cause of Willis's stab wound, and took her identification. Nothing in the record shows that a reasonable person under these same circumstances would believe that she could not leave. For these reasons, Rankin has not proven that her "pivotal admission" was a product of custodial interrogation.

Second, Rankin argues that police physically prevented her from leaving the hospital because her "freedom of movement was restricted to a degree associated with [an] arrest." Rankin contends that, along with being handcuffed at the hospital,

14

she was handcuffed while being transported to the Homicide Division and to her home, and this procedure was "inherently restrictive" after "admitting to a crime." Detective Hernandez explained that Houston Police Department's transport policy requires passengers to be handcuffed solely for security purposes.

When asked about her reason for transporting Rankin in handcuffs, Detective Hernandez explained:

> A lot of people tend to be scared when handcuffs go on. So, I try to always tell people, you know, as easily as they go on is as easily as they come off. It doesn't mean you're under arrest, it just means I have to handcuff you.

The record reflects that Detective Hernandez did not handcuff Rankin for longer than was necessary to transport her from the hospital to the Homicide Division and from the Homicide Division to her home. She uncuffed Rankin as soon as she arrived at the destinations. Given the totality of these circumstances, the fact that she was transported in handcuffs alone does not constitute probable cause. *See State v. Sheppard*, 271 S.W.3d 281, 291 (Tex. Crim. App. 2008) (authorizing handcuffing suspect for reasonable amount of time to "safeguard the officers and assure the suspect's presence during a period of investigation").

Although we do not disagree with Rankin that the transportation policy must comport with the Fifth Amendment and that  a consensual encounter may escalate

15

to custodial interrogation, that did not happen here.[7] *See Dowthitt*, 931 S.W.2d at 255. Moreover, "[s]tationhouse questioning does not, in and of itself, constitute custody." *Id*. (citing *California v. Beheler*, 463 U.S. 1121, 1124–25 (1983)). Despite Rankin's contention that she was handcuffed and prevented from leaving, it is up to the trial court to resolve any conflicts in the evidence. *State v. Ross*, 32 S.W.3d 853, 854–55 (Tex. Crim. App. 2000) (en banc). It was within the trial court's discretion to believe or disbelieve Rankin's testimony. *Id*. at 855. It was also within the trial court's discretion to believe or disbelieve Detective Hernandez and Officer Evans's testimony. *Id*. Because the trial court noted several inconsistencies in Rankin's testimony and because we afford almost total deference to a trial court's fact-finding about whether she was in custody for Fifth Amendment purposes, we hold that

---

[7] Rankin cites a concurring opinion in *Bates v. State*, 494 S.W.3d 256, 284 (Tex. App.—Texarkana 2015, pet. ref'd) (Burgess, J., concurring). Justice Burgess analyzed *State v. Ortiz*, 346 S.W.3d 127, 133 (Tex. App.—Amarillo 2011), *aff'd*, 382 S.W.3d 367, 374 (Tex. Crim. App. 2012), which distinguished handcuffing under the Fourth Amendment and the Fifth Amendment. The Texarkana court held that the suspect was in custody for *Miranda* purposes because the reason defendant and his wife were handcuffed was because police had found "something illegal or dangerous" and noted that the defendant "was associated with his wife's illicit behavior." *Ortiz*, 382 S.W.3d at 374–75. The Court of Criminal Appeals observed that the lower court "certainly did not categorically hold, as the State suggests, that the mere act of handcuffing, by itself, will establish custody." *Id*. "[T]he determination of 'whether handcuffing [the defendant] placed him in custody for *Miranda* purposes does not turn on the reasonableness, under the Fourth Amendment, of [the officer's] decision to handcuff him for officer safety. The two inquiries are related but they are not the same.'" *Id*.

Rankin did not establish that her statements were the product of custodial interrogation. *See Herrera*, 241 S.W.3d at 526.

Rankin also argues that she was physically prevented from leaving the hospital because her cell phone, identification, and purse were taken from her and that she could not leave because her car was being searched by law enforcement. She does not contend that officers subjected her to a coercive environment. As the United States Supreme Court noted, "Even when officers have no basis for suspecting a particular individual, they may . . . ask to examine the individual's identification and . . . request consent to search" her belongings, absent any threats or coercion. *Bostick*, 501 U.S. at 435. The record reflects that Rankin voluntarily turned over her identification and other belongings and that she signed two consent forms authorizing officers to search the Cutlass as well as her other car. The consent forms that Rankin acknowledged reading and signing also informed her about her right to refuse.

The showing that a suspect has been warned that she does not have to consent to the search and has a right to refuse is of evidentiary value in determining whether a suspect validly consented. *See Allridge v. State*, 850 S.W.2d 471, 493 (Tex. Crim. App. 1991) (en banc). Thus, Rankin's encounter with the officers was consensual because she could have refused consent to search her vehicle and left, but she did not. *See, e.g.*, *Goines v. State*, 888 S.W.2d 574, 578 (Tex. App.—Houston [1st Dist.]

17

1994, pet. ref'd) (detention was temporary, consensual encounter where officers took car keys from defendant and defendant signed consent form informing him of right to refuse consent to search his car). Rankin therefore has not established that officers physically prevented her from leaving.

Third, Rankin contends that her interrogation was custodial because the officers had probable cause to arrest her. According to Rankin, the officers had probable cause to arrest her because she admitted to causing Willis's injuries and because Detective Hernandez stated her "story seemed incomplete," called the District Attorney's Office, and enlisted the help of the Homicide Division.

The United States Supreme Court held that it is the "compulsive aspect of the custodial interrogation, and not the strength or content of the government's suspicions at the time the questioning [is] conducted" that determines custody for *Miranda* purposes. *Stansbury*, 511 U.S. at 323. And, in this case, no compulsive aspect existed. Detective Hernandez testified that there was not "sufficient probable cause" to arrest Rankin. Even if Detective Hernandez suspected that Rankin had something to do with causing Willis's injuries, the District Attorney confirmed the lack of probable cause and rejected the charges against Rankin. Thus, there was no manifestation of probable cause that would have led Rankin to believe that she was under arrest. *Cf. Dowthitt*, 931 S.W.2d at 255. We therefore conclude that the trial court did not err by denying Rankin's motion to suppress. The trial court's decision

to deny her motion to suppress was within the zone of reasonable disagreement. *See Martinez*, 348 S.W.3d at 922. We overrule Rankin's first issue.

**Sufficiency of Evidence**

**A.    Self-Defense**

In her second issue, Rankin challenges the legal and factual sufficiency of the evidence to support the jury's rejection of her self-defense claim because, according to Rankin, her use of force was reasonable and immediately necessary. Rankin argues that she stabbed Willis because she believed that he would choke her to death. She claims that the evidence supports a finding that she was a victim of domestic violence and acted in self-defense. Because Rankin raised self-defense, the State had to two tasks to convict her for murder: (1) prove the elements of murder beyond a reasonable doubt and (2) persuade the jury that Rankin did not kill Willis in self-defense. *See Cleveland v. State*, 177 S.W.3d 374, 379 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd) (en banc). Rankin contends that the evidence is legally and factually insufficient to support her conviction for murder because she acted in self-defense.

*1.    Standard of review*

Because the State bears the burden of persuasion to negate self-defense by proving its case beyond a reasonable doubt, we review both legal and factual sufficiency challenges to the jury's rejection of self-defense under the *Jackson v.*

*Virginia* standard. *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307 (1979)). Under that standard, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *See Jackson*, 443 U.S. at 319; *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009). Viewed in the light most favorable to the verdict, the evidence is insufficient under this standard when either: (1) the record contains no evidence, or merely a "modicum" of evidence, probative of an element of the offense; or (2) the evidence conclusively establishes a reasonable doubt. *See Jackson*, 443 U.S. at 314, 319 n.11, 320; *Laster*, 275 S.W.3d at 518. "[We] may not re-evaluate the weight and credibility of the record evidence and thereby substitute its own judgment for that of the fact finder." *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). We defer to the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19). We presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we defer to that resolution. *Jackson*, 443 U.S. at 326; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

### 2. *Applicable law*

A person commits murder if she "intentionally or knowingly causes the death of an individual" or "intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual." *See* TEX. PENAL CODE § 19.02(b)(1)–(2). The Penal Code also provides that "a person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." *Id.* § 9.31(a). Deadly force in self-defense is justified when a person reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful deadly force or to prevent the other's imminent commission of murder, among other crimes. *Id.* § 9.32(a).

The defendant bears the of producing some evidence to support a claim of self-defense. *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018). Once the defendant produces some evidence raising self-defense, the State bears the burden of persuasion to show beyond a reasonable doubt that the defendant's actions were not justified. *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003); *Saxton v. State*, 804 S.W.2d 910, 913 (Tex. Crim. App. 1991) (en banc). To meet its burden of persuasion, the State need not produce additional evidence but must prove its case beyond a reasonable doubt. *Saxton*, 804 S.W.2d at 913. The jury is the sole

judge of the credibility of defensive evidence, and it is free to accept it or reject it. *See Braughton*, 569 S.W.3d at 609 (citing *Saxton*, 804 S.W.2d at 914).

If the jury finds the defendant guilty, it has made an implicit finding against any defensive theory raised by the defendant. *Saxton*, 804 S.W.2d at 914; *see also Zuliani*, 97 S.W.3d at 594. "[A] defensive instruction is only appropriate when the defendant's defensive evidence essentially admits to every element of the offense *including* the culpable mental state, but interposes [a] justification to excuse the otherwise criminal conduct." *Shaw v. State*, 243 S.W.3d 647, 659 (Tex. Crim. App. 2007).

### 3. *Denial of Self-Defense*

Rankin testified that she acted in self-defense because she was a victim of domestic violence. Willis had a history of getting "upset" and starting arguments that turned into physical altercations. Although she had not seen any of the altercations, M.R. testified about witnessing Rankin's injuries she allegedly sustained from Willis before the stabbing incident. Photographs of Rankin's black eye and bruises were admitted into evidence. Rankin did not report this abuse because she was "scared" and "didn't want [Willis] to go to jail." Despite the physical abuse, Rankin stayed in the relationship with Willis because she "loved him" and "saw the good in him." Dr. V. Sloan, a clinical psychologist, testified that she had diagnosed Rankin with "post-traumatic stress disorder" because Rankin had

22

a "long history as an adult of being in relationships with men who were very violent, who were very abusive to her, who would swear and refer to her by obscenities."

Rankin also claimed that she acted in self-defense when Willis assaulted her on the day of the stabbing incident. After Rankin and Willis began arguing, M.R. saw Willis grab and lunge at Rankin. M.R. ran to their apartment to retrieve a bat to help her mother. With no witnesses in sight, Rankin testified that Willis shouted expletives at Rankin, grabbed her hand, and choked her. She felt like she "was about to die." Rankin struggled to loosen Willis's grip from her wrist. By her own admission, Rankin could free herself from Willis's grasp before using the knife she kept to pry the hood of her car open to "poke" him in the chest, even though she could have easily retreated to her apartment across the street. Willis then walked away, got in the car, and tried to drive away. Next, Willis parked the car, got out, and collapsed to the ground. Rankin realized that Willis was unconscious and unresponsive, called 911, and quickly rushed him to the hospital.

From Rankin's own testimony, a rational jury could have therefore concluded that deadly force was not immediately necessary for Rankin to defend herself from an unarmed man. *Mitchell v. State*, 590 S.W.3d 597, 604–05 (Tex. App.—Houston [1st Dist.] 2019, no pet.) (defendant not entitled to use deadly force when unarmed aggressor let defendant go before defendant picked up a gun and fired at victim); *Sanchez v. State*, 418 S.W.3d 302, 310 (Tex. App.—Fort Worth 2013, pet. ref'd)

23

(defendant "acted out of anger, not protective instinct, in pursuing the unarmed [complainant]"); *Wilson v. State*, No. 01-17-00788-CR, 2019 WL 346892, at *3 (Tex. App.—Houston [1st Dist.] Jan. 29, 2019, pet. ref'd) (mem. op., not designated for publication) (no evidence of self-defense when defendant shot man who stepped back and threw his hands up after wrestling with defendant).

The State presented evidence supporting the jury's rejection of Rankin's self-defense claim. Rankin never told officers that Willis was abusive, that he choked her, or that she stabbed him in self-defense. Officers observed no apparent injuries around her neck or wrist. Rankin ultimately "claimed to have no knowledge that [the stabbing] happened at the time it happened, had no intent, and claimed it was an accident," but changed her explanation at trial. To prove a claim of self-defense, the defendant must admit to having the intent to kill or cause serious bodily injury to the victim to save herself. *See Shaw*, 243 S.W.3d at 659. Rankin did not admit she intended to kill or seriously harm Willis. Rather, she said she "poked" Willis to get him off of her.

A rational jury also could have reasonably concluded that Rankin's failure during questioning to disclose their abusive relationship or that she "poked" him in the chest conflicted with her claim of self-defense at trial. The jury could have reasonably found Rankin incredible because she did not claim self-defense until she testified at trial. And, as a matter of law, Rankin had no right to a jury finding that

24

she killed Willis in self-defense because she did not admit to having the culpable mental state for murder. See *Shaw*, 243 S.W.3d at 659.

After reviewing all the evidence in the light most favorable to the verdict for legal sufficiency analysis, we conclude that a rational jury could have reasonably found against Rankin on self-defense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 318–19. We overrule Rankin's second issue.

## B. Sudden Passion

In her third issue, Rankin contends the evidence is legally and factually insufficient to support the jury's finding at punishment that she did not kill Willis under the immediate influence of sudden passion.

### 1. *Applicable law*

At the punishment stage of a murder trial, a defendant may reduce a murder charge from a first-degree felony to a second-degree felony by proving by a preponderance of the evidence that she "caused the death under the immediate influence of sudden passion arising from an adequate cause." *See* TEX. PENAL CODE § 19.02(d); *see also Hernandez v. State*, 127 S.W.3d 206, 211–12 (Tex. App.— Houston [1st Dist.] 2003, pet. ref'd). "'Sudden passion' means passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation." TEX. PENAL CODE § 19.02(a)(2). "'Adequate

25

cause' means cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." *Id.* § 19.02(a)(1); *cf. Moncivais*, 425 S.W.3d at 407 (ordinary anger or fear alone does not raise an issue of sudden passion arising from adequate cause).

### 2. *Legal sufficiency*

#### a. <u>Standard of review</u>

In *Brooks*, the Court of Criminal Appeals held that the *Jackson v. Virginia* standard is the only standard that a reviewing court should apply in determining whether the evidence can support each element of a criminal offense that the State must prove beyond a reasonable doubt. *Brooks*, 323 S.W.3d at 895 (citing *Jackson*, 443 U.S. at 319). We review issues on which the defendant had the burden of proof by a preponderance of the evidence, like sudden passion, under a different standard and apply the legal sufficiency standard used in civil cases. *See Smith v. State*, 355 S.W.3d 138, 147 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd).

We apply a two-step analysis under the civil legal sufficiency standard. *Moncivais v. State*, 425 S.W.3d 403, 407 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd). First, we review the record for any evidence that supports the jury's negative finding while ignoring all evidence to the contrary. *Id.* Second, if no evidence supports the negative finding, then we examine the entire record to determine

whether the evidence establishes the affirmative defense. *Id*. We must defer to the fact finder's determination of the weight and credibility to give the testimony and the evidence at trial. *See Cleveland*, 177 S.W.3d at 388–89.

## b. Legally sufficient evidence of no sudden passion finding

In examining the record under the first prong of the civil legal sufficiency standard, we conclude that some evidence supports the jury's negative finding on sudden passion. The evidence at trial does not show that the Rankin acted under the immediate influence of sudden passion arising from an adequate cause. At most, Rankin said that she was "terrified," "scared," and "horrified" during their altercation based on their history of domestic violence. "For a claim of fear to rise to the level of sudden passion, the defendant's mind must be rendered incapable of cool reflection." *Gonzales v. State*, 717 S.W.2d 355, 357 (Tex. Crim. App. 1986) (en banc).

The record does not show that Rankin was "emotionally aroused" to the point that she would be incapable of a cool reflection period. *Id*. Instead, Rankin testified that she maintained that she remained calm and maintained her composure before, during, and after the stabbing. For example, Rankin testified that she defused the argument before she stabbed Willis when she noticed her questioning frustrated him. She rejected his help and opted to fix the car herself. Another example of Rankin's ability to pause is that she "call[ed] out for help from God," despite losing her breath

27

from Willis's chokehold. Rankin testified, "Like—just—something allowed my wrist to break free. And, when I did, I just took the knife and I poked him once." Even Rankin's mental state after the stabbing shows that she was capable of cool reflection. Rankin testified that she sat inside her car and started crying after Willis walked away. We therefore conclude that Rankin's own testimony does not support a finding that Rankin had acted under the immediate influence of sudden passion arising from adequate cause. *See Gonzales*, 717 S.W.2d at 357–58 (evidence legally sufficient to support jury's rejection of sudden passion because appellant "stayed cool and maintained his composure" throughout confrontation with victim).

The record satisfies the first prong of civil legal sufficiency standard of review because evidence exists that Rankin was not under the immediate influence of sudden passion when she stabbed Willis. *See Moncivais*, 425 S.W.3d at 408; *Cleveland*, 177 S.W.3d at 390. Thus, we need not address the second prong of the civil legal sufficiency standard—whether Rankin proved sudden passion—because that prong only applies if no evidence supports the jury's finding. See *Cleveland*, 177 S.W.3d at 389. We hold that the evidence is legally sufficient to support the jury's negative finding of sudden passion. *See Smith*, 355 S.W.3d at 147.

### 3. *Factual sufficiency*

#### a. Standard of review

In reviewing an issue on which the defendant has the burden of proof by a preponderance of the evidence, we apply the factual-sufficiency standard in *Meraz v. State*, 785 S.W.2d 146, 154–55 (Tex. Crim. App. 1990) (en banc). *See, e.g.*, *Cleveland*, 177 S.W.3d at 390–91 (applying *Meraz* standard to review factual sufficiency of jury's negative sudden passion finding). "[T]he *Jackson v. Virginia* standard advanced in *Brooks* applies to a sufficiency review of the elements of the offense the State must prove beyond a reasonable doubt, not to the jury's negative finding of an issue on which the defendant had the burden of proof by a preponderance of the evidence." *Moncivais*, 425 S.W.3d at 408; *see Brooks*, 323 S.W.3d at 924 n. 67 (Cochran, J., concurring) (noting that factual sufficiency standard in *Meraz* is appropriate for review of issues like sudden passion on which defendant has burden of proof by preponderance of evidence). Under the *Meraz* standard, we review all of the evidence in a neutral light to determine whether the verdict is so against the great weight and preponderance of the evidence as to be "manifestly unjust, conscience-shocking, or clearly biased." *Matlock v. State*, 392 S.W.3d 662, 671 (Tex. Crim. App. 2013). "We may not, however, intrude on the fact finder's role as the sole judge of the weight and credibility of the witnesses' testimony." *Moncivais*, 425 S.W.3d at 408.

### b. Factually sufficient evidence of no sudden passion finding

Rankin relies largely on her own testimony to argue that the jury's finding of no sudden passion was against the great weight and preponderance of the evidence. She essentially makes a self-defense argument. Rankin testified that she always kept a knife in her car to open its damaged hood because she often experienced electrical problems. She took out the same knife on the day of the incident to open her hood. She also testified that the argument escalated into a physical altercation—just like their past disputes—and Willis choked her before she "poked" him with the knife after feeling like she would die from strangulation. Rather than pursue Willis when he walked away, Rankin sat in her car and cried until she noticed Willis collapse to the ground. She called 911 and drove about 95 miles per hour to take Willis to the hospital for his stab wound.

The jury also heard other evidence from which it could have found sudden passion. M.R. testified that she peered outside the apartment because her mom was taking too long to return home. M.R. saw Willis drive into the parking lot across the street and park next to Rankin's car. M.R. also testified that she heard Willis yelling, saw him behaving aggressively, and noticed that "his nostrils had flared up" and that his "face turned very bright red" with "rage." Finally, M.R. testified that she saw Willis grab and lunge at Rankin, causing her to run back into the house to get a bat to defend her mother.

Several witnesses testified that Rankin omitted the details about the argument and physical altercation when she described to officers how she stabbed Willis. The jury could have reasonably believed Detective Hernandez and Officer Lujan's testimony that they did not see any injuries on Rankin, despite Willis standing six feet tall and weighing around 215 pounds when he had allegedly choked her. In other words, a violent attack by a large man would have left bruises, scratches, or other injuries so obvious that any ordinary person, let alone trained officers, would have inquired more about the cause.

As the sole judge of the weight and credibility of a witness's testimony, the jury had a right to believe the officers' testimony. And the jury had a right to disbelieve Rankin and M.R.'s testimony. *See Hernandez*, 127 S.W.3d at 214; *Moncivais*, 425 S.W.3d at 409; *Trevino v. State*, 157 S.W.3d 818, 822 (Tex. App.—Fort Worth 2005, no pet.) ("The jury was free to make its own determination of appellant's credibility and reject appellant's version of events if it did not believe he was telling the truth").

This is where the dissent goes wrong. A finding of sudden passion here depended on the jury accepting Rankin and M.R.'s version of events. *See, e.g.*, *Smith v. State*, 355 S.W.3d 138, 149 (Tex. App. – Houston [1st Dist.] 2011, pet. ref'd). They did not.

The jury was free to doubt the defense's testimony as a matter of witness credibility, as a matter of lack of supporting physical evidence, or because Rankin changed her story. *See id*.; *Hernandez*, 127 S.W.3d at 214. To hold otherwise is to substitute our judgment for that of the jury. Instead, without a contradictory showing from the record, we defer to the jury's determinations about the weight and credibility of the evidence. *Johnson v. State*, 23 S.W.3d 1, 8 (Tex. Crim. App. 2000) (en banc).

Viewing all of the evidence in a neutral light, we cannot say that the jury's finding of no sudden passion is so weak as to be manifestly unjust or against the great weight and preponderance of the evidence. *See Hernandez*, 127 S.W.3d at 213. We overrule Rankin's third issue.

## Spectator Outburst

In her fourth issue, Rankin contends that the trial court abused its discretion when it refused to grant a mistrial after a spectator yelled "That's all lies!" during defense counsel's opening statements. She acknowledges that the trial court promptly instructed the jury to disregard, but she argues that there was "no adequate remedy for tainting the minds of the jury." The State responded that Rankin failed to show a reasonable probability that the words interfered with the jury's verdict.

32

## A. Standard of review and applicable law

We review a trial court's denial of a mistrial for an abuse of discretion, and we must uphold a judge's decision denying a mistrial if it was in the zone of reasonable disagreement. *Archie v. State*, 340 S.W.3d 734, 738–39 (Tex. Crim. App. 2011); *see Griffin v. State*, 571 S.W.3d 404, 416 (Tex. App.—Houston [1st Dist.] 2019, pet. ref'd). "A mistrial is required when the question is 'clearly calculated to inflame the minds of the jury and is of such character as to suggest the impossibility of withdrawing the impression produced on their minds.'" *Hernandez v. State*, 805 S.W.2d 409, 414 (Tex. Crim. App. 1990) (en banc) (quoting *Gonzales v. State*, 685 S.W.2d 47, 49 (Tex. Crim. App. 1985) (en banc)).

A mistrial occurs only in extreme circumstances where the prejudice is incurable. *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004) (en banc). In determining whether a mistrial is warranted, we balance three factors: (1) the severity of the misconduct, (2) curative measures, and (3) the certainty of conviction without the misconduct. *See id*. at 75. A trial court's prompt instruction to the jury to disregard improper testimony will cure error. *See Ovalle v. State*, 13 S.W.3d 774, 783 (Tex. Crim. App. 2000) (en banc). We presume the jury followed the trial court's instructions to disregard the outburst. *Hernandez*, 805 S.W.2d at 414.

## B.    Denial of Mistrial

The audience member made a single, brief, unsolicited emotional statement before the trial court promptly reprimanded him and dismissed him from the courtroom. Afterwards, the trial court granted Rankin's request for a curative instruction and told the jury:

> The only thing that you may consider as evidence in this case is evidence that's introduced to you and evidence received from the witness stand. I'm going to instruct you to disregard the statements from the audience.

We presume that the jury followed the trial court's instruction to disregard the spectator's outburst. *See Wesbrook v. State*, 29 S.W.3d 103, 116 (Tex. Crim. App. 2000) (en banc). Given the brief, isolated nature of the statement, the trial court's decision that any prejudice flowing from the statement was curable was within the zone of reasonable disagreement. We conclude the trial court did not abuse its discretion in denying Rankin's motion for mistrial. *See, e.g.*, *Coble v. State*, 330 S.W.3d 253, 290–93 (Tex. Crim. App. 2010) (mistrial unwarranted when trial court instructed the jury to disregard outbursts of crying and expletives from two witnesses); *Gamboa v. State*, 296 S.W.3d 574, 580 (Tex. Crim. App. 2009) (no abuse of discretion when trial court denied defendant's request for a mistrial and instructed jury to disregard an outburst from victim's family member). We overrule Rankin's fourth issue.

**Conclusion**

We affirm the trial court's judgment.

Sarah Beth Landau
Justice

Panel consists of Justices Keyes, Kelly, and Landau.

Justice Keyes, dissenting.

Publish.  TEX. R. APP. P. 47.2(b).